CALDWELL et al. v. TWIN FALLS SALMON RIVER LAND & WATER CO. et al.

(District Court, D. Idaho, S. D. June 29, 1915.)

No. 494.

1. WATERS AND WATER COURSES ☞254—IRRIGATION SYSTEMS—CONTRACTS WITH SETTLERS—CONSTRUCTION.

A corporation which had contracted with Idaho for the construction of an irrigation system made contracts with settlers which recited the execution of the state contract, the commencement of construction work, and notice from the State Land Board that it might sell or contract rights to the use of water, and which provided that in consideration of the payment of a specified sum, and the covenants of the settlers, the settlers should become entitled to shares of stock in a corporation organized to operate the system, which certificate declared that the owner thereof

was entitled to receive one-hundredth of a cubic foot of water per second per acre for land described, and to a proportionate interest in the system, and which fixed the irrigation season from April 1st to November 1st of each year. The settlers obligated themselves to pay at the rate of $40 per acre for water. *Held*, that the settlers' contracts for water were contracts for the sale of a specific water right for each acre of land described and a proportionate interest in the system.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☞254.]

2. WATERS AND WATER COURSES ☞254—IRRIGATION SYSTEMS—CONTRACTS TO SUPPLY WATER—CONSTRUCTION.

A contract between a corporation and Idaho for the construction of an irrigation system and subsequent contracts between the corporation and settlers to supply the settlers with water for irrigation must be read together to determine the rights of the settlers, though their contracts, in so far as they expressed the agreement, are controlling, provided they contravene no statute of the state or federal government.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☞254.]

3. WATERS AND WATER COURSES ☞254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A contract between a corporation and Idaho for the construction of an irrigation system, binding the corporation to build the system, to sell shares or water rights therein, to transfer the ownership of the system to the settlers, and to supply a reservoir capacity, and a canal capacity of one-hundredth of a second foot for each acre of land sold, reciting that the corporation holds a permit for the appropriation of 1,500 second feet of the waters of a river and that it has been determined that the natural flow of the stream, supplemented by a reservoir capacity, will provide 2¾ acre feet of water per acre for each acre to be irrigated, and authorizing the corporation at its option to contract to sell rights, authorizes the corporation to make contracts with settlers for the sale of water to the amount of one-hundredth of a cubic foot per acre and a proportionate interest in the system.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☞254.]

4. WATERS AND WATER COURSES ☞254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A stipulation, in a contract between a corporation and Idaho for the construction by the corporation of an irrigation system, that no application to enter land will be approved by the state unless the applicant shall have entered into a contract with the corporation for the purchase of sufficient shares or water rights for the irrigation of the land, such shares or water rights to be evidenced by the stock of another corporation to be formed to ultimately take title to and operate the system, shows that the corporation, contracting to furnish water to settlers, sells water rights and not merely certificates of stock in the corporation to be formed to take title and operate the system.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☞254.]

5. WATERS AND WATER COURSES ☞254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A stipulation, in a contract between a corporation and Idaho for the construction by the corporation of an irrigation system, that priority of application for water rights or priority of entry and settlement shall not confer on the settler priority in the use of water, must be read in connection with the stipulation that, to the extent of the capacity of the irrigation works and to the extent of the water rights to which the corpo-

ration is entitled, it shall sell or contract to sell water rights, and a stipulation prohibiting the sale of water rights beyond the carrying capacity of the system, and when so read it does not imply an understanding that water rights may be sold in excess of the normal capacity of the system, but applies to seasons of abnormally low water, and forestalls any claim that might be set up by the earlier settlers that they were entitled to be supplied to the full extent of their rights to the exclusion of later settlers at any time when, due to abnormal conditions or casualty, there was insufficient water to supply all rights.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☜254.]

6. WATERS AND WATER COURSES ☜254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A provision, in a contract between a corporation and Idaho for the construction by the corporation of an irrigation system and for the organization of another corporation to take title to and operate the system, that each of the shares or water rights shall represent a carrying capacity sufficient to deliver water at the rate of one-hundredth of one cubic foot of water per second, and each share or water right sold or contracted to be sold shall represent a proportionate interest in the canal and irrigation works, together with all rights and franchises therein, based on the number of shares finally sold, must be construed against the corporation preparing the contract, and when so construed is in harmony with subsequent contracts between the corporation and settlers, stipulating that the settlers shall receive one-hundredth of a cubic foot of water per acre per second during the irrigation season.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☜254.]

7. WATERS AND WATER COURSES ☜254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A stipulation, in a contract between a corporation and Idaho for the construction by the corporation of an irrigation system, for the transfer of the ownership and control to a new corporation, organized to take over title to and operate the system, and for the issuance to the settlers of a share of stock therein for each acre of land for which a water right was sold, and that the capital stock thereof shall consist of 150,000 shares, intended to represent one share for each acre which may be irrigated from the system, does not give any right to sell water rights in excess of the available water supply, where other provisions of the contract declare that the corporation, to the extent of the capacity of the irrigation works and to the extent of the water rights to which it is entitled, shall sell water rights, and prohibit the sale of water rights beyond the carrying capacity of the system or in excess of the appropriation of water therefor.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☜254.]

8. WATERS AND WATER COURSES ☜254—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A stipulation, in a contract between a corporation and Idaho for the construction by the corporation of an irrigation system, that water is to be delivered for irrigation purposes in such quantities and at such times as the condition of the crops and the weather may determine, does not qualify the rights of settlers defined in subsequent contracts between the corporation and settlers, stipulating for furnishing one-hundredth of a cubic foot of water per acre per second.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☜254.]

9. WATERS AND WATER COURSES ⊚⟶251—IRRIGATION SYSTEMS—CONTRACTS FOR CONSTRUCTION—RIGHTS AND LIABILITIES.

A contract between a corporation and Idaho for the construction by the corporation of an irrigation system provided that the certificate of shares of stock of a new corporation, to be organized to take title and operate the system, should be made to indicate the interests represented in the system—a water right of one-hundredth of a cubic foot per second for each acre of land irrigated and a proportionate interest in the system. It also recited that the corporation held a permit for the appropriation of 1,500 second feet of the waters of a stream and that it had been determined that the natural flow thereof, supplemented by a reservoir, would be sufficient to supply 2¾ acre feet per acre for each acre to be irrigated, and that each of the shares or water rights should represent a carrying capacity sufficient to deliver water at the rate of one-hundredth of one cubic foot of water per acre per second and represent a proportionate interest in the system. *Held*, that the contract did not contemplate a sale only of undivided interests in water, and it was not inconsistent with contracts with settlers to furnish one-hundredth of a cubic foot of water per acre per second.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ⊚⟶254.]

10. WATERS AND WATER COURSES ⊚⟶254—IRRIGATION SYSTEMS—CONTRACTS FOR WATER—RIGHTS AND LIABILITIES.

Though the waters of the state belong to the public, and though the private right which an individual acquires by appropriation or purchase is usufructuary only, an owner of land, in the exercise of ordinary prudence, may by appropriation or contract provide himself with an available water supply, which shall be subject to his demand at all times when he has need therefor, and a contract for a specific amount of water is not objectionable as encouraging wasteful use thereof.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ⊚⟶254.]

11. WATERS AND WATER COURSES ⊚⟶254—IRRIGATION SYSTEMS—CONTRACTS FOR WATER—RIGHTS AND LIABILITIES.

A contract of sale of one-hundredth of a cubic foot of water per acre per second, fixing the irrigation season from April 1st to November 1st of each year in accordance with a contract between Idaho and a corporation for the construction of an irrigation system and the sale of water rights, expresses the understanding of the parties touching the total amount of water the corporation must have available to comply with the contract and binds the corporation to make provision for that quantity.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ⊚⟶254.]

12. WATERS AND WATER COURSES ⊚⟶254—IRRIGATION SYSTEMS—CONTRACTS FOR WATER—RIGHTS AND LIABILITIES.

Where contracts between a corporation constructing an irrigation system and settlers for the supplying to the settlers of water for irrigation stipulate for an inadequate supply of water, the court could not grant relief to the settlers, nor could it grant relief to the corporation, contracting to furnish more water than the settlers needed, but the terms of the contracts defined the rights and obligations of the parties.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ⊚⟶254.]

13. WATERS AND WATER COURSES ⊚⟶254—IRRIGATION SYSTEMS—CONTRACTS FOR WATER—RIGHTS AND LIABILITIES—JURISDICTION OF COURTS.

Where a corporation which had contracted with Idaho for the construction of an irrigation system made contracts with settlers calling for the supplying of water in excess of the capacity of the system, the court could not scale down proportionately the amount of the water

rights and the consideration to be paid therefor, but would compel the corporation to rescind all contracts which could be rescinded and restrain it from collecting overdue installments on contracts until there was reasonable assurance that the water contracted for would be delivered.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 311; Dec. Dig. ☞254.]

In Equity. Suit by A. E. Caldwell and others, in their own behalf and in behalf of all persons similarly situated, against the Twin Falls Salmon River Land & Water Company and others. Decree for plaintiffs ordered.

C. O. Longley and W. E. Golden, both of Twin Falls, Idaho, for complainants.

S. H. Hays, of Boise, Idaho, for defendant Twin Falls Salmon River Land & Water Co.

P. B. Carter, of Boise, Idaho, for Salmon River Canal Co.

Richards & Haga and McKeen Morrow, all of Boise, Idaho, for Commonwealth Trust Company of Pittsburgh and A. C. Robinson.

DIETRICH, District Judge. This controversy grows out of the construction, under the Carey Act (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 [Comp. St. 1913, § 4685]), of an irrigation system commonly known as the Salmon River project. The plaintiffs are severally in the possession of lands upon the project, and hold what are called settlers' contracts for water for the irrigation thereof; they bring this suit not only for themselves but in behalf of all other settlers. The defendant Twin Falls Salmon River Land & Water Company, hereinafter called the "Company," is the corporation which, pursuant to the Idaho statutes, contracted with the state for the construction of the system and made agreements with the plaintiffs and others for water rights. It also issued bonds, to secure the payment of which it assigned as collateral these settlers' contracts to the defendant Robinson, and executed a trust deed on all of its interest in the system to the defendant Commonwealth Trust Company of Pittsburgh, as trustee. All of its property rights are thus hypothecated as security for the payment of its bonds, the interest upon which has for some time been in default. The defendant Salmon River Canal Company is the corporation organized as provided in the state contract and the settlers' agreements, for the purpose of ultimately taking title to, and operating, the system; as yet it is but the creature, and is under the control, of the Company.

The contract with the state was executed April 30, 1908, and the opening for entry to holders of water right agreements of 80,000 acres of land was advertised for June 1, 1908; and when this suit was commenced the Company had executed numerous agreements for water rights covering an aggregate of 73,000 acres. The gist of the plaintiffs' complaint is not that the construction work has been improperly done, but that this acreage is greatly in excess of the area for which water is available, even during years of normal run-off. For that reason, they contend, the Company has failed to comply with the

terms of its agreements, and accordingly they are refusing to pay the installments due on account of the purchase price. The trustee and the collateral holder are demanding payment, and have brought several suits in foreclosure, which naturally have caused some irritation, and altogether much unrest prevails. While it is highly desirable that the controversy be fully and finally settled without delay, its immediate determination is attended with great, if not insurmountable, difficulties. The project is dependent for its water supply upon the Salmon river, a stream which, except during the flood-water period in the spring, is a creek rather than a river. And the chief feature of the project, therefore, is a reservoir, by which it was contemplated there could be stored, for use in the summer season, 180,000 acre feet. But, in determining at the present time the available supply during an average year, we are not only confronted with the uncertainties inherent in an estimate of the probable run-off of a variable stream, but we would be driven to a measure of speculation as to what the normal loss, now very great, will ultimately be from seepage in both the reservoir and the canals. And in addition to this consideration the Company is presently engaged in litigation with other claimants, who assert a superior right to divert large amounts of water from the higher reaches of the stream and its tributaries. Moreover, when it is remembered that there are no other accessible water resources, and that there is a provision in the contract putting all water-right agreements upon an equal footing regardless of the date of their execution, it will be seen that the question of an appropriate and feasible remedy is a most perplexing one, should it be held that the plaintiffs are entitled to relief.

[1] The fundamental question is one of the meaning of the contracts. The issue here is a broad one. The plaintiffs contend that primarily they contracted for a water right of a definite amount, which incidentally carried with it ownership of an undivided interest in the system. The defendants say that only an undivided interest in the system was sold, which carried no specific amount of water, but only a divisional share, the extent of which must depend upon the ratio between the water actually available for the system and the aggregate number of contracts which the Company sees fit or is able to sell.

It is quite impracticable here to follow in detail the elaborate argument by which the defendants seek to maintain their position. It is not convincing. In the first place, it is highly improbable that settlers would have signed a contract by which they must obligate themselves to pay at the rate of $40 per acre for the mere chance of sharing with an indefinite number of others in a projected irrigation system concerning the capacity and efficiency of which they could, in the nature of things, have but little information. As is well known, those who buy water rights upon these projects are generally men of small means, without irrigation experience, widely scattered, and often residing a long distance away. They are not directly interested in the project as a whole, but they want to know what 40 or 80 or 160 acres of land will cost with an adequate water right. They have no means of determining whether a proposed reservoir will hold water, or whether the watershed is sufficient to fill it; these are matters pe-

culiarly for the Company to investigate. Can it for a moment be supposed that even the most susceptible could be induced to sign contracts if they were informed that the Company would give no promise of a sufficient supply, no assurance of any specific quantity, no undertaking that any given amount would be available for the project as a whole, and no guaranteed limit upon the number of acres for which water rights would be sold?

Upon the other hand, as bearing upon the probability or improbability of the willingness of the Company to sell a specific right or a definite quantity, it had full confidence in the adequacy of its supply. In a printed circular setting forth the advantages of the project, we have, among others, these statements:

"Water supply of the best and in abundance. * * * The water supply * * * is obtained from the Salmon river, which has a vast drainage area in the Cassia National Forest Reserve. The water right is perfect, and there is no land susceptible of irrigation above the Salmon tract, and no water rights in contest. It carries water sufficient for the irrigation of more than 150,000 acres in normal years, and as a rule the spring run-off is far greater than the amount of water required for the irrigation of this amount of land for the full season."

It will thus be seen that no doubt was entertained of an abundance of water, and, if it was confident of a supply sufficient in normal years for 150,000 acres, there is no apparent reason why it should not, for the purpose of selling rights for 80,000 acres, make its contracts attractive by incorporating therein an undertaking to furnish a comparatively small specific amount; with such a margin of safety there could be no substantial risk.

Now as to the contracts themselves: A printed form was prepared by the Company and offered to the public, which is the form held by the plaintiffs and all other settlers. This recites the incorporation of the Company, its execution of the state contract, the commencement of construction work, notice from the State Land Board that it (the Company) migh proceed to sell or contract rights to the use of water, and thereupon it is agreed that in consideration of the payment of a certain amount of money, and the covenants on the part of the settler, the settler "shall become entitled to ——— shares of the stock of the Salmon River Canal Company, Limited, the certificate thereof to be in form as follows":

"...... Shares. .........................................190...

"This is to certify ...... is the owner of ...... shares of the capital stock of the Salmon River Canal Company, Limited.

"This certificate entitles the owner thereof to receive one-hundredth of a cubic foot of water per acre per second of time for the following described land: ...... in accordance with the terms of the contract between the state of Idaho and the Twin Falls Salmon River Land & Water Company and this certificate also entitles the owner to a proportionate interest in the dam, canal, water rights and all other rights and franchises of the Twin Falls Salmon River Land & Water Company, based upon the number of shares finally sold in accordance with the said contract between the said company and the state of Idaho.

"Salmon River Canal Company, Limited,
"By .............., President

"Attest: ............, Secretary."

Then follows a clause dedicating the water right to the land described, and to none other.    There are numerous other provisions touching the manner and times for paying the purchase price and maintenance charges, the temporary operation of the system, and other subjects not relevant to the present inquiry.    The irrigation season is defined to be from April 1st to November 1st of each year.    Certain other clauses which may be deemed to be pertinent are as follows:

"Said certificate (that is, said certificate of stock) to be delivered as provided for in said state contract and under the conditions therein stated. * * * This agreement is made in accordance with the provisions of said contract between the state of Idaho and the company, which, together with laws of the state of Idaho under which this agreement is made, shall be regarded as defining the rights of the respective parties, and shall regulate the provisions of the shares of stock to be issued to the purchaser by the Salmon River Canal Company, Limited. * * * This contract is made pursuant to and subject to the contract between the company and the state of Idaho, and the existing laws of said state."

The import of the instrument, standing alone, as it would be understood by an intelligent layman with no preconceived notions of its meaning, is not open to debate.    It is a contract for the sale of a specific water right of one-hundredth of a second foot per acre for each acre of land described, and as an incident thereto a proportionate interest in the irrigation system.    The holder of a certificate of stock, so the contract reads, is entitled "to receive one-hundredth of a cubic foot of water per acre," and "a proportionate interest in the dam, canal, water rights," etc.    The defendants' contention wholly ignores the first of these co-ordinate clauses, and limits the right granted precisely to the second.    But the clauses are neither inconsistent with each other nor identical in meaning, and no reason is apparent why they should not both be given effect.    If the suggestion be made that in form the contract provides only for the transfer of the certificate of stock in the Canal Company, and does not in terms convey a water right at all, the answer is that the technical form is quite unimportant.    The clear purport of the entire instrument is the sale of the water right, and that is undoubtedly the sense in which the Company expected it would be understood, and in which it was understood by the settler.    One of the preliminary recitals is that the State Board had notified the Company that it could proceed to sell, not certificates of stock, but water rights; and paragraph 3 reads: "The consideration for the water rights hereby agreed to be conveyed is the sum of $———," etc.    It will not be assumed that the instrument was cunningly drawn to deceive the unwary, "to keep the word of promise to the ear and break it to the hope."

[2] By itself the settler's contract thus appears to be unequivocal, and we next inquire whether its apparent import is materially qualified by its references to and adoption of the state contract.    Doubtless the two instruments must be read together, and in some respects the one is to be deemed the complement of the other.    But it is to be borne in mind that the settlers' contracts are subsequent in time to that of the state, and in so far as they clearly and fully express the agreement of the parties upon a given subject they are controlling,

provided, of course, they contravene no statute of the state or of the nation.

[3] In this connection it is not to be overlooked that the state contract expressly provides that the Company may at its option contract· to sell rights upon terms more favorable than those which it prescribes. But, were a different view to be taken, is there anything in the state contract so opposed to the idea of a water right of a definite amount that it must be held to render the granting clause in the settler's contract inoperative? The first paragraph binds the Company to build the system, "and to sell shares or water rights" therein, "and also to transfer the ownership," etc., of the system to the settlers—a general plan entirely in harmony with the settler's contract. By paragraph 2 the Company is required to supply a reservoir capacity of 180,000 acre feet, and a canal capacity of one-hundredth of a second foot for each acre of land sold. In paragraph 4 there is an apparent difficulty, not, however, strictly in relation to the proposition of a definite water right; a specific amount is suggested which does not appear to correspond with that called for by the settler's contract. The paragraph recites that the Company holds a permit for the appropriation of 1,500 second feet of the waters of Salmon river, and thereupon the statement is made that it "has been determined" that the natural flow of the stream, supplemented by a reservoir capacity of 180,000 acre feet, will be sufficient to provide "two and three-fourths acre feet of water per acre for each acre of land to be irrigated." Thereupon follows a reiteration of the obligation of the Company to construct canals of a sufficient capacity for one-hundredth of a second foot per acre. Now assuming a continuous flow of one-hundredth of a second foot per acre throughout the entire period from April 1st to November 1st of each year, there is a want of correspondence between 2¾ acre feet and one-hundredth of a second foot, for a flow of one-hundredth of a second foot would deliver 2¾ acre feet in approximately 4½ months. But it may very well have been understood that, while the nominal irrigation season extended from April 1st to November 1st, as a matter of fact the actual season is much shorter, and in that view the discrepancy is more formal than real.

[4] In paragraph 6 it is agreed, upon behalf of the state, that no application to enter land will be approved unless the applicant shall have entered into a contract with the Company "for the purchase of sufficient shares or water rights" for the irrigation of the land, "said shares or water rights to be evidenced by the stock of the Salmon River Canal Company"—language which makes additionally clear the fact that the Company was selling water rights, not merely certificates of stock in another corporation.

[5] In the same paragraph is found an agreement that priority of application for water rights, or priority of entry and settlement, shall not confer upon the settler priority of right in the use of water. This stipulation is not to be taken as implying an understanding that water rights might be sold in excess of the normal capacity or serviceability of the system, for it is to be read in connection with another clause in the same paragraph, providing that, "to the extent of the capacity· of the irrigation works and to the extent of the water rights to which

it is entitled," the Company shall sell or contract to sell water rights; and the last part of paragraph 9, which expressly prohibits the sale of water rights "beyond the carrying capacity of the canal, or in excess of the appropriation of water therefor." This provision against priority of right was doubtless inserted to cover seasons of abnormally low water, and to forestall the claim that might be set up by the earlier settlers that they were entitled to be supplied to the full extent of their rights, to the exclusion of later settlers, at any time when, due to such abnormal conditions or to some casualty, there was insufficient water fully to supply all rights. In that view the several provisions of the contract are in harmony, and all are given effect; whereas, if the defendants' contention be adopted, not only is the express language of the settler's agreement set at naught, but the clauses last above quoted from the state contract are rendered meaningless. For if the settlers' contracts convey no specific water rights, but only undivided interests in the system, it is manifest that such water right as the Company possesses never could be exhausted or exceeded, for any right, be it large or small, is capable of division into an infinite number of shares.

[6] In paragraph 8 is found the following provision:

"Each of said shares or water rights shall represent a carrying capacity in said canal sufficient to deliver water at the rate of one-hundredth ($1/100$) of one (1) cubic foot of water per acre per second of time, and each share or water right sold or contracted to be sold as herein provided shall also represent a proportionate interest in said canal and irrigation works, together with all rights and franchises therein, based upon the number of shares finally sold in said canal."

Standing alone, this language is susceptible to a construction tending to support the defendants' contention; but it may also be read entirely in harmony with the settler's contract. Under the familiar rule that a printed form of agreement will be construed most strongly against the party by whom it is prepared, the doubt here would have to be resolved against the Company, even if we had nothing but the state contract. And why, it is pertinent to ask, should the state have so carefully insisted upon a canal capacity of one-hundredth of a second foot per acre if the water was not to be supplied up to practically that capacity? It would seem to be wanton waste to build a canal twice the size needed. It is futile to say that an additional capacity might have been required for the rotation system of delivery, the possibility of which was contemplated, for, under such a system, the flow in the main canals and laterals is not necessarily variable; the fluctuation or periodic use is only in the sublaterals and individual ditches.

[7] In paragraph 10 provision is made for the organization by the Company of the Salmon River Canal Company, and the transfer to it of the ownership and control of the system, and for the issuance to the settlers of a share of stock therein for each acre of land for which a water right is sold. The capital stock of the company, it is stipulated, shall consist of 150,000 shares, "which amount," such is the provision, "is intended to represent one share for each acre of land which may be hereafter irrigated from said canal." But, while

225 F.—38

thus provision is made for the possible irrigation of 150,000 acres, there is no right or license implied to sell water rights in excess of the available supply of water, whatever that may turn out to be. Plainly the clause is to be read together with the limitation in that respect already discussed.

[8] It is sought to attach significance to other language found in paragraph 10, to the effect that water is to be delivered for irrigation purposes in such quantities and at such times as the condition of the crops and the weather may determine. By its very terms this provision is made to relate only to the period during which the Company shall have charge of the system, before it passes into the control of the water users. But, putting aside that consideration, manifestly the regulation pertains, not to the measure of the settler's water right, but only to the method of giving such right its greatest efficiency. Probably never before in Southern Idaho, save in some exceptional case, had water been given so high a duty as one-hundredth of a second foot to the acre. In the early history of the state at least one-fiftieth of a second foot was generally recognized as being necessary, and in more recent years, upon the more expensive projects, the duty was more or less frequently increased to one-eightieth of a second foot. It is reasonable to assume, therefore, that both the officers of the Company and the State Land Board realized the necessity of adopting economical methods for distributing and applying the water, if the allotment of one-hundredth of a second foot was to prove sufficient and satisfactory. Undoubtedly rotation of use is superior to the more primitive method of continuous flow, and therefore the Company was authorized, so long as it remained in control, to establish such system, and accordingly to deliver the water to which the settler was entitled at such times and in such quantities as would best supply his needs; but in thus providing for an efficient method of delivery no authority was implied to reduce the aggregate amount or volume to which the settler is entitled. Therefore the provision, even if it could be regarded as of continuing force, in no wise tends to qualify the settler's right as the same is defined in his contract.

[9] Perhaps in greater detail than the reasonable length of a judicial opinion would ordinarily warrant, I have now brought under review all the clauses of the state contract which can be deemed to give even the most remote support to the defendants' contention; and it is submitted that they present no real conflict with the settler's contract. Upon the other hand, we find upon further examination that in its most vital feature the precise language of the latter is expressly authorized by the former, for in paragraph 10 of the state contract it is directed that:

"The certificate of shares of stock of the Salmon River Canal Company, Limited, shall be made to indicate and define the interests thereby represented in the said system, to wit: A water right of one-hundredth of a cubic foot per second for each acre of land irrigated, as provided in paragraphs IV and VIII of this contract, and a proportionate interest in the said canal and irrigation works, based upon the number of shares ultimately sold therein."

Moreover, by its reference to paragraphs 4 and 8, this provision illuminates their meaning and brings them clearly into harmony with

the settler's contract. It is accordingly concluded that the theory of a sale only of undivided interests is untenable.

[10] Now shifting their position, the defendants say that if anything more than an undivided interest was sold it was not a specific amount of water, but only a right to use such quantity from time to time as might be reasonably necessary to supply the settler's needs. Such presumptively must have been the intention of the parties, so it is argued, for a contract for a definite water right, if not in contravention of the Constitution and statutes, is opposed to the policy of the state, in that the only right the individual can acquire in water is the right to apply it to a beneficial use, and, inasmuch as needs are always variable and fluctuating, title to a definite or specific quantity of water cannot be granted or acquired. Such plausibility, however, as the reasoning may have, is due to a confusion of terms, and a consequent confusion of ideas. It may be conceded that the waters of the state belong to the public, and that the private right which the individual acquires by appropriation or purchase is usufructuary only, and further that at any given time the extent of his reasonable need is the measure of the maximum amount he is entitled for the time being to divert from the stream or to receive and use. But this is not to say that in the exercise of ordinary prudence the owner of land may not, by appropriation or contract, provide himself with an available supply which shall be subject to his demand at all times when he has need therefor. Were the defendants' contention to prevail, the existing uncertainty and instability of titles to water rights would give place to utter chaos. If, for the reasons counsel advance, it was incompetent for the settler to contract for a specific right, it was equally incompetent for the Company by appropriation to acquire any specific or definite right. Water decrees adjudicating the extent of appropriators' rights would be of no effect, and that which the defendants are urging here, namely, a determination of the duty of water, would be an idle thing; for what the farmer needs this year for the proper irrigation of his crops may be too much or too little for the coming year. A contract for a specific amount no more warrants or encourages wasteful use than does a judicial decree or State Engineer's permit. The possibility that the settler may not at all times be able to use the maximum of his available right, whether such right be acquired by appropriation or by contract, is without significance. That is only to say that in that event, and for the time being, the water becomes subject to use by others having inferior rights. I know of no consideration of public policy opposed to the exercise by farmers of that degree of prudence which is expected of men in other vocations in providing a margin of safety to cover contingencies. What would be thought of a hydro-electric company furnishing light and traction facilities to an urban community, if it relied upon a power installation just sufficient to meet the needs of the community in normal years, without any margin of safety to cover the contingency of low water or of casualties known to be incident to such an enterprise? If the settler's right is barely sufficient for his needs in the ordinary years and in the absence of mishaps, manifestly he must suffer loss when the run-off falls below the average, or when, through accidents to the system, there is par-

tial or temporary loss of the use of water, or when, because of light precipitation and other weather conditions, the need of water is unusually large. Ordinarily for the farmer not to make provision against such contingencies would be counted against him for carelessness. So far as I am aware, it has never been held or contended that in making an appropriation of water from a natural stream the appropriator is limited in the right he can acquire to his minimum needs, and no reason is apparent why one who contracts to receive water from another should be limited to such needs. Conservation of water is a wise public policy, but so also is the conservation of the energy and well-being of him who uses it. Economy of use is not synonymous with minimum use. Better four prosperous farmers than five who are unsuccessful because of the uncertainty in the water supply, and better four farms uniformly fruitful than five upon which failure is ever imminent, and to which it is bound to come on the average one year in five.

[11] Now if the contract is lawful, and if therefore the Company could and did contract for the sale of specific rights, and if such rights were not to be sold in excess of the water supply, what is the quantitive measure, if any, provided by the contracts for such rights? We have seen that the sale was of "one-hundredth of a second foot" to the acre, and ordinarily, it is to be conceded, if this phrase were used with reference alone to a water right in the natural flow of a stream, it would be accepted as a sufficiently clear and complete description in itself. It would import a right in the owner at any time he had need, and so long as he had need, to divert and use a stream of the magnitude thus described. The question of the quantity of water, in cubical measure, would rarely arise, for no one would be interested in calling it up. But here the outstanding feature of this system is the reservoir, and obviously in estimating the acreage capacity of a reservoir we must not only have the size of the stream to be delivered per acre, but also the length of time it is to run. Upon this point of time, it must be conceded, the contracts taken together are not wholly free from ambiguity. If we dismiss, as I think we may, without discussion, the idea that either party has the power to determine the period to suit himself, there are left three possible alternatives. We may couple the one-hundredth of a second foot with the duration of what is designated as the irrigation season—that is, from April 1st to November 1st of each year—and conclude that the settler is entitled to receive a total quantity of water equal to a continuous flow at the rate of one-hundredth of a second foot per acre for the entire season, which would amount to approximately 4⅕ acre feet. In this view the settler who uses no water during the months of April and May could double the supply to which he would ordinarily be entitled during the months of June and July. While the language of the contracts is susceptible to such a construction, it is doubtful whether at the time they were executed any water rights had ever been so defined in this section of the country, and it is wholly improbable that either party contemplated such a radical departure from irrigation practice.

A second view is that we may reject the period of the irrigation season as not having anything to do with the question of the quantity of water, but only as establishing the limits of time beyond which no water could be furnished, and adopt the theory that one-hundredth of a second foot was to be delivered during this period at such times only as the settler's need required, without the right on his part to hoard or save for the future by failing to use continuously, and hence without the right at any time to demand a flow in excess of one-hundredth of a second foot per acre. Such a right would be closely analogous to that of one who, as an original appropriator, is decreed at the rate of one-hundredth of a second foot per acre of the natural flow of the stream; he would have the right to divert that amount continuously up to the limit of the beneficial use to which he could apply it, but he could not, by refraining from use to-day, divert twice the amount to-morrow. The difficulty about this view is that it fails to take account of the necessity of measuring the reservoir, and hence leaves hopelessly uncertain one factor essential to the computation of the required capacity of the system as a whole. But not only here is that one of the vital questions, but it is reasonable to suppose that the parties had it more or less definitely in mind when they entered into the contracts.

A third view, and one which in many respects is identical with the one just discussed, but which covers the point last noticed, is that a right was contemplated sufficient to enable the settler to receive water at the rate of one-hundredth of a second foot per acre continuously during the season of actual irrigation needs, the amount of which the parties estimated and understood to be $2\frac{3}{4}$ acre feet; and this view I am inclined to adopt. It is not at variance with any of the terms of the contract, it gives a measure of effect to all, and is in conformity with current and general irrigation practice in the state, with reference to which it may be assumed the parties contracted; and furthermore it entails no unreasonable results. The parties doubtless understood that, while it is provided that water could be demanded at any time between April 1st and November 1st, demands in April and October would be exceptional, and in May and September generally very light, and that it was therefore reasonable to assume that on the average a resource of $2\frac{3}{4}$ acre feet would be sufficient to supply the settler's right of a continuous flow, during the irrigation period, of one-hundredth of a second foot per acre. Practically, therefore, and in effect, the provision in the state contract with regard to the $2\frac{3}{4}$ acre feet is not inconsistent with or a limitation upon the definition of the settler's right embraced in his contract, namely, a right to receive one-hundredth of a second foot during the season of his need for water; it is merely the expressed understanding of the parties touching the total amount of water the Company must have available in order safely to provide for this need and thus to comply with its contract. In effect it amounts to an agreement by the Company that it will make provision for that quantity, and an agreement upon the part of the state and the settler that such provision will be accepted as full compliance with the obligation to supply the settler up

to the limit of his needs at the rate of one-hundredth of a second foot per acre during the entire irrigation season from April 1st to November 1st. In this way, upon the one hand, the right of the settler is defined, and upon the other the duty of the Company is made clear and specific. The latter could not legitimately sell water that it did not have, and when at the rate of 2¾ acre feet per acre it had sold up to the available supply in its reservoir, as supplemented by the natural flow of the stream during the irrigation season, it was bound to stop.

There is no force to the argument by which the defendants attempt to array against this view the provisions of paragraph 10 of the state contract, authorizing rotation of use, and delivery "in such quantities and at such times as the condition of the crops and the weather may determine." Note has already been made of the fact that these provisions are temporary only, and are in terms limited to the brief period of the Company's control and administration of the system, and the whole argument might properly be dismissed with the suggestion that we are led into confusion rather than into clarity of reasoning by doing violence to the language of the contract and arbitrarily assuming that these provisions are upon the same footing with others of a permanent character. But, if for the sake of the argument we join with the defendants in indulging this unwarranted assumption, the general conclusion here reached is in no wise affected. It is plain that the two clauses, the one providing for one-hundredth of a second foot per acre, and the other for "such quantities  *  *  *  as the condition of the crops and weather may determine," if they relate to the same subject-matter, cannot stand together; one is constant and the other variable, and plainly as measures of a single right or duty they are inconsistent. The one must be understood to pertain to the extent of the right and the other to the method of delivery. How can we say that the settler's right is the right to receive such amounts of water and at such times during the irrigation season as the condition of his crops may require, and at the same time say that the water is to be delivered to him at the rate of one-hundredth of a second foot per acre? That would be a contradiction of terms. Upon the other hand, to say that the right is to receive water at the rate of one-hundredth of a second foot per acre, flowing continuously during the actual irrigation season, the amount thereof being estimated at 2¾ acre feet, and that this amount be delivered from time to time in such quantities as the conditions require, is to define the right and to prescribe a method of delivery involving no contradictions or inconsistencies, and no departure from the best irrigation practice. As already noted, this latter view is the only one under which these clauses in paragraph 10, treated as permanent provisions, can be given effect without rendering inoperative other clauses of the contract, and in this view they are in no wise opposed to the theory of a definite and specific water right.

[12] It is scarcely necessary to add that, if the view I have taken of the meaning of the contracts is correct, the duty of water, when applied in accordance with principles which are coming to have the sanction of scientific experimentation, is an immaterial in-

quiry. The rights of the parties are defined by their written agreements, and even if upon investigation we should find, in harmony with the popular view, that one-hundredth of a second foot is quite inadequate, no relief upon that account could be granted to the plaintiffs. So, upon the other hand, and for like reasons, a finding that the settler could get along with something less than that amount would furnish no ground upon which to relieve the defendant company from its contractual obligations. Whatever may be the proper duty of water, we cannot make a new agreement for the parties. If the right granted is too great, and the settler attempts to use water wastefully, that is a matter of which the state and other appropriators upon the stream may complain; it is no concern of the defendants. The terms of the agreement were fixed by the Company, not by the settler; presumably the latter was induced to obligate himself to pay the price in the expectation that he would get the proposed water service. It may be assumed that at the time the contracts were negotiated the Company deemed it impracticable to adopt a higher duty for water, and thought that few would be willing to undertake to reclaim the land, and in many cases to risk their all, without the assurance of at least the supply agreed upon. They are entitled to receive what they contracted for. It is to be borne in mind that the evidence touching the duty of water was not offered for the purpose of illuminating the meaning of the writings. Possibly knowledge of what at the time they were executed, was generally understood to be a reasonable amount of water for irrigation needs, might be of some assistance in determining the meaning the parties attached to the phraseology employed; but manifestly the present views of scientific experts and skilled specialists cannot be considered for that purpose, and in that view the evidence was excluded.

To summarize, the contract, as I have construed it, runs counter to no provision of the Constitution, no statute, and no principle of public policy. The right provided for is no more specific than that defined and established by a judicial decree or by a proceeding before the State Engineer in favor of an original appropriator. The construction no more authorizes or permits wasteful use than does a decree or a State Engineer's permit. It eliminates inconsistencies and gives effect to all the provisions of the agreements. Not only is it in accord with the plain import of the language employed, but it is strongly supported by the surrounding circumstances. As we have seen, the Company had confidence that the stream would supply a sufficient amount for 150,000 acres, and it procured a permit sufficient to provide at the rate of one-hundredth of a second foot per acre for that area. At that time water rights were customarily appropriated, decreed, contracted for, and sold, as definite quantities, and with rare, if any, exceptions, the amount deemed to be necessary, both popularly and by the courts, exceeded the amount here provided for. In the light of these circumstances, the contract must have appeared to be a reasonable one for the Company to make, and no argument of improbability is available as a ground for qualifying the meaning which the phraseology naturally imports.

[13] If then the settler is entitled to receive one-hundredth of a second foot or 2¾ acre feet per acre, it stands conceded that the Company sold, and has outstanding, contracts very greatly in excess of the capacity of the system. Just what this excess is I do not at the present juncture attempt to determine. Aside from the consideration that the period during which we have accurate information touching the run-off of the watershed is comparatively short, and therefore the data inconclusive, a definite finding upon this point should await the final determination of claims of other appropriators upon the stream, which are now in the course of adjudication in this court. Prior rights are asserted under these claims, and they are of such magnitude that no reliable computation can be made of the amount of water probably available for this project, in normal years, until their status and dignity are determined. It is also highly desirable, if not wholly indispensable, that we have the benefit of further experience and observation touching the amount of seepage which may be permanently expected in both the reservoir and the canals.

## Relief.

While, if the conclusions I have reached are correct, plainly the settlers are entitled to a measure of relief, a feasible remedy is not so clear. The obvious course would be to require the Company to supplement its existing water supply, but additional water is not to be had. If it be suggested that the area of the tract be reduced by cutting off all contracts executed after the full capacity of the system had been sold, it is to be said that, even should it be held that such a course is legally possible, it could not be taken without the presence of all the contract holders; and, furthermore, it is not impossible that some of those who contracted last have been more diligent in reclaiming their lands and placing improvements thereon than those who contracted earlier. So of the suggestion that all contracts be scaled down proportionately both in the amount of the water right and the consideration to be paid therefor—the practical difficulties are very great, and we have not before us the contract holders, who are admittedly indispensable parties to such relief. The Company should, of course, sell no more rights, and, if it be necessary, should be restrained from so doing. Furthermore, it should, in so far as may be practicable, call in such outstanding contracts as are subject to rescission. It was represented at the trial, as I understood, that so many contracts had been abandoned, and so many others are subject to forfeiture, that the Company might, at its option, reduce the aggregate of the outstanding contracts from approximately 73,000 acres to approximately 55,000 acres. It should be required to exercise its right of rescission wherever it exists, and by negotiation it is reasonable to believe it may further reduce the irrigable area. It should also be restrained from attempting to collect overdue installments on contracts until there is reasonable assurance that the settlers will receive that for which they have promised to pay. For the present at least I do not look favorably upon the prayer for a receiver. The system is apparently being carefully and intelligently managed, and no relief is needed in that respect. The suggestion that a receiver collect the installments due, for the purpose

of creating a fund out of which to pay damages, if feasible at all, does not impress me as being presently necessary. An order or an interlocutory decree will be entered restraining the Company from making any contracts or waiving any right of forfeiture of existing ones, and also restraining it, together with the other defendants, from collecting or attempting to enforce payments upon the contracts until the settlers' have been provided with the water supply contracted for, or are given trustworthy assurance that it will be provided. Leave will be granted to either party to make application at any time for the introduction of further proof touching the available water supply, and more particularly relating to: (1) The amount and dignity of the rights awarded to adverse claimants in the Vineyard Company suit hereinbefore referred to and now pending in this court; (2) seepage in the reservoir basin and the canal system; and (3) the aggregate amount of water contracts actually outstanding at the time of the application; and, upon the submission of such proof, for the entry of a final decree.