R. GLAVIN, G. A. SALEE, C. L. McFARLAND, BERYL KUNKEL, J. E. POHLMAN, A. E. CALDWELL, C. W. STRICKLING, R. A. CARTER, ALBERT HOLMQUIST and ORVILLE E. PARROTT, in Their Own Behalf and in Behalf of All Persons Similarly Situated With Them, Respondents, v. SALMON RIVER CANAL COMPANY, LTD., a Corporation, and ROBERT RAYL, Appellants. J. E. CLINTON, Intervenor and Appellant.

[226 Pac. 739.]

CAREY ACT—WATER CONTRACTS—SETTLERS' CONTRACTS—SECRETARY OF THE INTERIOR—STATE LAND BOARD—REDUCTION OF ACREAGE OF IRRIGATION PROJECT — RELINQUISHMENT BY STATE — VESTED INTEREST IN WATER RIGHT—SALE AND TRANSFER OF WATER RIGHT—BONDS—BONDHOLDERS — TRUSTS—TRANSFER OF STOCK—INJUNCTION—NONJOINDER OF PARTIES—RECORD—DEMURRER.

1. Where the record is silent as to the action of the court upon a demurrer, the demurrer will be deemed to have been waived.

2. Where the acreage of a Carey Act project is reduced on account of insufficient water supply, settlers owning water rights within the excluded area are not deprived of their rights by such reduction of acreage but have a vested right in such water rights, and the same are property subject to sale by the owners and subject to be transferred to lands within the retained area.

3. Where such rights are evidenced by shares of stock in the operating company and the same are purchased by persons other than the operating or construction company and sold to settlers within the

restricted area, and such shares of stock are presented to the operating company with a request that the same be transferred and a new certificate issued to the purchaser, the operating company has authority and is required to make such transfer upon its books and to issue a new certificate to the purchaser for the number of shares represented by the old certificate in lieu thereof.

4. The mere fact that bonds of a construction company of a Carey Act project, used in whole or in part in the construction of an irrigation system, were purchased by certain bondholders who formed a bondholders' committee for their protection, and such committee purchased vested water rights dedicated to land which had been excluded from the project, does not constitute the bondholders or the bondholders' committee trustees of such water rights for the benefit of settlers within the retained area.

5. An owner of a water right by purchase or original appropriation may sell the water right separate and apart from his land.

APPEAL from the District Court of the Eleventh Judicial District, for Twin Falls County.   Hon. T. Bailey Lee, Judge.

Action for injunction to restrain transfer of stock and delivery of water.   Judgment for plaintiffs.   *Reversed.*

Jas. R. Bothwell and Richards & Haga, for Appellant Salmon River Canal Co.

The excluded settlers had vested water rights.   (*Sanderson v. Salmon River Canal Co.,* 34 Ida. 145, 199 Pac. 999.)

Their water rights were property which under the laws of Idaho could be transferred and sold.   (*Sanderson v. Salmon River Canal Co., supra; Village of Hailey v. Riley,* 14 Ida. 481, 95 Pac. 686, 17 L. R. A., N. S., 86; *Bennett v. Twin Falls etc. Co.,* 27 Ida. 643, 150 Pac. 336.)

Turner K. Hackman, for Appellant Rayl.

The demurrer of the defendant, Robert Rayl, should have been sustained because of lack of proper parties defendants, it being shown that over 200 land owners within the patented area hold one and five-sevenths shares of stock to each irrigable acre owned by them, and none of these other parties are before the court.   (*Sanderson v. Salmon*

*River Canal Co.*, 34 Ida. 145, 199 Pac. 999; *Colorado Milling & Elevator Co. v. Larimer et al.*, 26 Colo. 47, 56 Pac. 185; *Beasley v. Shively*, 20 Or. 508, 26 Pac. 847; *State v. Guilbert*, 56 Ohio St. 575, 60 Am. St. 766, 47 N. E. 551, 38 L. R. A. 519; *Hobbs v. Twin Falls Canal Co.*, 34 Ida. 380.)

"This vested right to the use of the water may be sold and transferred, either with or separate from the land on which it ripened, or changed to other lands, and does not depend upon the point of diversion, the place of application the conduit, or the character of the use." (*Sanderson v. Salmon River Canal Co., supra; Arnold v. Roup*, 61 Colo. 316, 157 Pac. 206; *Village of Hailey v. Riley*, 14 Ida. 481, 95 Pac. 686, 17 L. R. A., N. S., 86; *Bennett v. Twin Falls etc. Co.*, 27 Ida. 643, 150 Pac. 336.)

John W. Graham, H. C. Mills and A. A. Fraser, for Respondents.

The individual settlers knew from the terms of the state contract and their individual contracts that all water rights upon this segregation were equal as to amount and priority, and having this knowledge the bondholders' committee could not purchase the outstanding water rights which should be distributed equitably over the segregation. (*Whitehorn v. Cranz*, 20 Neb. 398, 30 N. W. 406.)

The bondholders having purchased these outstanding water rights to protect their security and comply with the demand of the state and federal authorities that all the available water supply should be applied to the 35,000 acres, cannot claim adversely to the settlers' outstanding rights, but having elected to do so they held them in trust for the settlers upon the 35,000-acre tract. (*Shepherd v. Vincent*, 38 Wash. 454, 80 Pac. 779; *Hall v. Westcott*, 15 R. I. 373, 5 Atl. 631; *Savings & Loan Soc. v. Davidson*, 97 Fed. 696, 38 C. C. A. 365.)

BUDGE, J.—This action was brought by respondents in their own behalf and in behalf of all persons similarly situated, seeking an injunction to restrain appellant, Salmon

River Canal Company, Ltd., from delivering water through its canal system to the settlers receiving water therefrom, in a manner and by a method which it is claimed will result in a discrimination in favor of certain settlers and to the injury and detriment of respondent and all other settlers similarly situated.

From the record the following facts appear: In August, 1907, the state, through its State Board of Land Commissioners, made application to the Secretary of the Interior to segregate, under what is commonly known as the "Carey Act" and acts amendatory thereof and supplemental thereto, 127,707.29 acres of arid lands. The application contemplated the reclamation and irrigation of these lands from the surplus and unappropriated waters of Salmon River, by means of a reservoir to be constructed in Salmon River, the same to have a capacity of 180,000 acre-feet, from which water was to be conveyed and distributed to the lands by an adequate irrigation system. On or about April 10, 1908, the Secretary of the Interior duly segregated the said 127,-707.29 acres of arid lands, the same to be irrigated and reclaimed in the manner set forth in and contemplated by the application, such irrigation system to be constructed by or under the supervision of the state of Idaho.

On April 30, 1908, the Twin Falls Salmon River Land & Water Company, a Delaware corporation, sometimes referred to as the "construction company," entered into a contract with the state of Idaho, through its State Board of Land Commissioners, to construct the reservoir and irrigation system and immediately thereafter commenced work thereon. By the terms of the contract the construction company agreed to sell to persons filing upon lands susceptible of irrigation from the system, by a good and sufficient contract of sale, with right of possession and enjoyment by the purchaser pending its fulfillment, a water right or share in said canal for each and every acre filed upon or purchased from the state or acquired from the United States. Each of said shares or water rights was to represent a carrying capacity in the canal system sufficient to deliver

water at the rate of one hundredth of one cubic foot per second of time per acre and to represent a proportionate interest in the canal and irrigation system together with all rights and franchises therein, based upon the number of shares finally sold in said canal. It was further stipulated that the price per share should not exceed $40. The contract further provided that a corporation should be organized to take over the management and operation of the system, to be known as the Salmon River Canal Company, Limited, such corporation to be capitalized upon the basis of one share of stock for each acre of land to be irrigated from the system; that entrymen or purchasers were to receive, as evidence of their respective interests in the system, one share for each acre entered or filed upon, susceptible of irrigation from the system, and that water available for distribution should be distributed in accordance with the stock held in such corporation by entrymen or purchasers. The appellant corporation, sometimes known as the "operating company," was organized in pursuance of such state contract. The contract also provided that the operating company should be organized before any water rights were sold and that shares should be issued in that company as evidence of the amount of water to which the land owner was entitled, and this procedure was carried out by the construction company in the sale of water rights to settlers.

The state of Idaho, through its State Board of Land Commissioners, in the exercise of its supervisory powers, adopted and approved a form of contract to be used by the construction company for the transfer of shares or interest in the system, in which it was provided that the entrymen or purchasers should pay $40 for each share or interest. These contracts are commonly known as "settlers' contracts."

The respondents, their assignors or predecessors in interest made application to said construction company for the purchase of shares of stock and interests in said irrigation system and the construction company entered into contracts

with them, whereby the construction company agreed to deliver to them and each of them, during the irrigation season of each year, one hundredth of a cubic foot per second of time for the irrigation of each acre of land owned by them.

The construction company accepted applications for entry and entered into settlers' contracts with entrymen and owners of other desert lands situated under said irrigation system, including respondents, covering approximately 73,000 acres, which contracts were subsequently approved by the State Board of Land Commissioners. In 1916 the State Board of Land Commissioners canceled and annulled contracts covering approximately 13,000 acres, thus reducing the acreage under the system to approximately 60,070.8 acres, and declined to approve further contracts or to permit water to be used or distributed over any greater area. This reduction was made necessary by reason of the failure of entrymen on the 13,000 acres to make final proof as required by statute and the regulations of the State Board of Land Commissioners. Final proof was made to the state and certificates were issued for approximately 60,070.8 acres. The water right for the system and lands to be reclaimed was approved by the state of Idaho through its State Board of Land Commissioners and its State Engineer before any of the water rights involved herein had been sold by the construction company. On March 13, 1918, an order was made by the State Board of Land Commissioners that water from the system should be distributed and made appurtenant to approximately 35,000 net irrigable acres (the gross acreage being approximately 39,000 acres and including highways, ditches, canals and land therein not susceptible of irrigation from the system). This order was approved by the Secretary of the Interior who, on or about January 1, 1921, caused patents to be issued for said 39,000 gross acres to the state of Idaho, and the state of Idaho in turn has caused patents to be issued to settlers holding land within such restricted area. The Secretary of the Interior thereafter refused to issue patents for land outside of such area

for the reason that on or about May 23, 1921, the state of Idaho relinquished to the United States all of its right, title and interest in and to all lands originally segregated lying outside of the restricted and patented area, the water supply being insufficient to irrigate lands in excess of the 35,000 net irrigable acres. The entire works of the system were accepted by the state of Idaho through its State Board of Land Commissioners and on April 30, 1920, the construction company conveyed by appropriate assignment all of the property embraced in the system to the Salmon River Canal Company, Limited, and the latter has taken over absolute control and operation of said system without objection from any of its stockholders.

On June 1, 1908, the Twin Falls Salmon River Land & Water Company executed and delivered to the American Trust & Savings Bank of Chicago, as trustee, a deed of trust to secure the payment of approximately $1,732,000 in bonds, which deed of trust was duly and properly recorded. The deed of trust conveyed all of the rights, interest and franchises of the Twin Falls Salmon River Land & Water Company in and to the irrigation system, including all of its rights under its contracts with the state of Idaho and also all notes, contracts and mortgages then owned or to be afterwards acquired by it. The contracts involved in this action, exclusive of that of · J. E. Clinton, intervenor, were thus pledged by the construction company to the American Trust & Savings Bank as collateral security in accordance with the terms of the trust deed, and bonds of said company were issued and certified to the amount of approximately $1,732,000. Thereafter the Commonwealth Trust Company of Pittsburgh succeeded by assignment and substitution to all the rights of the American Trust & Savings Bank under said trust deed. Subsequently, upon default in payment of principal and interest, an appropriate action was brought to foreclose the trust deed and on July 12, 1921, decree of foreclosure was entered. The decree provided that the property covered by the trust deed should be sold as an entirety. Foreclosure sale was held on August

15, 1921, the property being sold to the People's Savings & Trust Company of Pittsburgh, and the sale was confirmed by the court on August 29, 1921. In accordance with the decree of foreclosure and the decree confirming the sale, an appropriate assignment was made by the Commonwealth Trust Company and the Twin Falls Salmon River Land & Water Company conveying all of their right, title and interest in and to the mortgaged property to the People's Savings & Trust Company of Pittsburgh "free and discharged of all liens and of the lien and trust of said mortgage, and of all supplements thereto, and all the bonds secured thereby, and of and from the claims of any and all parties to said suit, and any and all persons claiming by, through or under them, or either of them," without obligation on the part of said People's Savings & Trust Company of Pittsburgh to see to the application of the proceeds of said sale.

About the year 1914 a bondholders' protective committee was selected by holders of a majority of the bonds issued under said trust deed as a result of default in payment of interest on the bonds. This committee, after the reduction of the tract to 35,000 net irrigable acres, in order to improve the security on the water contracts held by the trustee for collection, to eliminate claims for damages and offsets, if any, against the holders of such collateral and to carry into effect the order of the State Board of Land Commissioners to reduce the tract to 35,000 net irrigable acres, spent approximately $400,000 in the purchase of shares of stock and water rights originally issued for land outside of the restricted and patented area of the project, amounting to approximately 20,000 shares, some of which were presented to the operating company with the request that the same be transferred upon its books. New certificates of stock were issued by that company in lieu of the surrendered certificates aforesaid to appellant Rayl and other settlers owning approximately 21,000 irrigable acres within the patented and restricted area, upon the basis of five-sevenths additional shares of stock for each irrigable acre of their lands. This transfer was made under the authority of a resolution of the

board of directors of the operating company duly made and adopted November 21, 1921, which is as follows:

"RESOLVED, That shares of stock heretofore issued for lands now excluded from the project may be transferred upon the books of the company and made appurtenant to lands within the retained and patented area in such a manner that one and five-sevenths (1.5/7) shares of stock may be appurtenant to each acre of land within said retained and patented area; and that the officers of the company be and they are hereby authorized to issue and deliver stock certificates in accordance herewith and as provided in the by-laws; and that the officers of the company be and they are hereby directed to deliver water in accordance with the number of shares appurtenant to tracts or parcels of land within the retained and patented area."

At a meeting of stockholders legally called and held on or about the 28th day of April, 1922, certain by-laws of the operating company were amended to read as follows:

"Section 8.   All the stock of this company shall be issued to and held by the Twin Falls Salmon River Land & Water Company in order to enable it to deliver shares of stock to purchasers of water rights, but said shares of stock shall have no voting power and shall have no force and effect and shall not be assessable for any purpose either for maintenance or otherwise until they have been sold or contracted to be sold to entrymen or owners of patented land under the irrigation system, and all assessments, maintenance and other charges must be paid by the purchaser or owner of the stock and not by the Twin Falls Salmon River Land & Water Company.   Shares of stock heretofore issued for lands now excluded from the project may be transferred upon the books of the company and made appurtenant to lands within the retained and patented area in such a manner that one and five-sevenths (1.5/7) shares may be appurtenant to each acre of irrigable land within said retained and patented area.   The officers of the Company are hereby authorized to issue and deliver stock certificates in accordance herewith and with these by-laws."

"Section 14. The Board of Directors shall employ suitable persons to manage and operate the irrigation system and shall make such rules and regulations with regard to the method of handling the water and the delivery thereof as they may deem advisable, and in making such rules and regulations may provide standards and methods of use for the water supply. The Board of Directors shall cause water to be delivered in accordance with the number of shares appurtenant to tracts or parcels of land within the retained and patented area. No person unless authorized by the Board of Directors shall have any power or authority to open, handle, operate or adjust any of the gates or canal outlets of the irrigation system and the Board of Directors may prescribe penalties for any interference with the water supply by any stockholder or for failure to pay maintenance charge or for failure or neglect to obey any rule with regard to the delivery or the handling of the water supply or the operation of the irrigation system."

Such amendments were duly adopted by a vote of 46,543.43 in favor thereof as against 634.85 in opposition thereto, the total number of shares in said company outstanding at the time being approximately 60,070.8 shares. Such amendments to the by-laws are still in full force and effect and have never been canceled or revoked.

The respondents are owners of land within the restricted and patented area and have paid or contracted to pay for their respective water contracts and certificates of stock have been issued to them by the Salmon River Canal Company, Limited, upon the basis of one share to the acre.

The appellant Rayl is the owner of certain lands within the restricted and patented area and has made additional contracts with and has purchased from the bondholders' committee heretofore mentioned, an additional five-sevenths of a share of stock in the Salmon River Canal Company, Limited, for each and every acre of land held by him, such stock having been previously issued to settlers on land without the patented and restricted area. A transfer of such shares of stock has been made upon the books of the Salmon

River Canal Company, Limited, to appellant Rayl in accordance with the resolution of its board of directors and the amendment to the by-laws hereinbefore mentioned. Rayl, together with the settlers on approximately 21,000 acres within the restricted area, owned by approximately 200 individuals, who have also purchased from the bondholders' committee five-sevenths of a share for each acre owned by them, now demand and insist that they be delivered water for such additional shares purchased, for which certificates have been issued by the company, and also for the shares of stock originally issued to them. The respondents and all parties similarly situated, consisting of approximately 131 individuals, are the owners of the remaining 14,000 acres within the restricted area, for which additional shares have not been purchased from the bondholders' committee or otherwise.

An allotment or apportionment of water for the season of 1922 was made by the board of directors of the Salmon River Canal Company, Limited, based upon the number of shares of stock so held by settlers within the restricted or patented area, and the board of directors threatened to deliver water to settlers who had purchased additional shares of stock in the company on the basis of one and five-sevenths (1.5/7) times as much as the respondents and parties similarly situated will receive by virtue of water contracts, water rights and shares of stock held by them. By such action on the part of the Salmon River Canal Company, Limited, respondents allege that the water available for the system for the season of 1922 would be only sufficient to irrigate and grow crops upon land owned by settlers within the restricted and patented area, if distributed *pro rata* and equally to all of the settlers upon an acreage basis. However, if water is distributed upon the basis of shares owned as contemplated by the board of directors, it will result in discrimination in favor of settlers who have purchased additional shares and against those who have not. The nature of the soil and the character of the crops grown upon the 14,000 acres are similar to those of the 21,000 acres. Re-

spondents and other settlers owning land within the 14,000 acres, who have not purchased additional shares, can now purchase additional shares from the bondholders' committee upon the same terms as those made by appellant Rayl and other parties owning land within the 21,000 acres to which additional stock has been issued.

Respondents sought by this action to enjoin the Salmon River Canal Company, Limited, from transferring the stock purchased by the bondholders' committee (formerly owned by the settlers outside of the restricted area) to settlers within the restricted area purchasing the same from the bondholders' committee; to cancel and annul the transfer of stock to appellant Rayl; to enjoin him from receiving water by virtue of such stock and to enjoin the Salmon River Canal Company, Limited, from delivering such water to him, and also to restrain and enjoin the Canal Company from delivering water for 1922 to settlers who had purchased additional stock, upon the basis of shares of stock rather than upon the acreage basis, and that the Salmon River Canal Company, Limited, be required to deliver water to all settlers within the restricted and patented area upon an acreage basis and not upon the basis of shares of stock owned in the company.

To the complaint general and special demurrers were filed by both Rayl and the Salmon River Canal Company, Limited. The record, however, fails to disclose the action taken by the court upon the same. Separate answers were filed by Rayl and the Salmon River Canal Company, Limited. Prior to the trial of the cause, upon application, J. E. Clinton was permitted, by appropriate order, to intervene. Thereafter his petition in intervention was filed wherein it is alleged that he is the owner and holder of a certain water contract between the construction company and one Elva McCollum, which is a lien upon certain lands owned by Joseph Beatty, Clarence N. Beatty and others, against whom the intervenor has commenced foreclosure proceedings; that the owners of said lands are defending said foreclosure action on the ground that their water right for the land

is insufficient, and that under the contract they hold only one share in the Canal Company for each acre of land, whereas the owners of the 21,000 acres for which additional shares have been purchased hold one and five-sevenths shares for each irrigable acre and that the Salmon River Canal Company, Limited, is delivering water in proportion to the number of shares of stock appurtenant to the respective tracts of land within the restricted and patented area; that the intervenor has purchased additional stock, formerly issued for lands without the project, sufficient to make 1.5/7 shares of stock appurtenant to each irrigable acre of said lands and is therefore interested in the subject matter of this action.   Intervenor adopted the answer and defenses of appellant, Salmon River Canal Company, Ltd., and by stipulation the complaint in intervention was deemed to be denied. Thereafter a stipulation of facts was entered into between counsel for all of the respective parties.   Upon such stipulation of facts and the facts as admitted by the pleadings the cause was tried to the court sitting without a jury.   Findings of fact and conclusions of law were made and filed by the court and judgment was awarded in favor of respondents enjoining the Canal Company from distributing the waters of the system on any other basis than a *pro rata* acreage basis and awarding judgment for costs against all appellants.   From this judgment this appeal is taken by the defendants and intervenor.

The appellant, Salmon River Canal Company, Limited, specifies and relies upon eight assignments of error, which we will dispose of in the order assigned.

"1. The Court erred in its Conclusion of Law No. 1 in holding and deciding that settlers who had purchased or acquired additional stock in the appellant company were not necessary or indispensable parties to this action."

The record is silent as to what action the court took upon the demurrers.   However, in the brief of counsel the demurrers are treated as though they were overruled.   Where the record is silent as to the action of the court upon the demurrer, the same will be deemed to be waived.   (*Diamond*

*Coal Co. v. Cook,* 6 Cal. Unrep. 446, 61 Pac. 578; *Burns v. Stolze,* 111 Wash. 392, 191 Pac. 642.) However, conceding that the court overruled the demurrers and that they were not waived and the question of nonjoinder of parties is properly before us, we have reached the conclusion that the demurrers were properly overruled, for the reason that it does not appear upon the face of the complaint that there is a nonjoinder of necessary, indispensable parties. In the case of *Brown v. Farmers' High-Line Canal & Reservoir Co.,* 26 Colo. 66, 56 Pac. 183, 185, the court, quoting from *Beasley v. Shively,* 20 Or. 508, 26 Pac. 846, said:

"A court may determine any controversy between the parties before it, when it can be done without prejudice to the rights of others, or by saving their rights."

To the same effect see *Sanderson v. Salmon River Canal Co., Ltd.,* 34 Ida. 145, 162, 199 Pac. 999.

"2. The court erred in its third conclusion of law in holding and deciding that the stock purchased by the bondholders' committee from the excluded lands was held in trust for the benefit of all settlers on the patented area."

If this action was upon the contract made between the construction company and the settlers there would be merit in the contention, or if the construction company was the purchaser of water rights without the patented area the rights so purchased would be held in trust for the benefit of all settlers on the patented area. The bondholders' committee represented holders of bonds issued by the construction company evidencing an indebtedness to the bondholders for money advanced for the construction of the system, and they are in nowise connected or acting for the construction or operating company. In our opinion there is no theory that can be logically advanced upon which it can be claimed that the bondholders' committee, by reason of the purchase of water rights without the patented area, can be held to be trustees for the settlers within the patented area. The settlers within the patented area did not furnish the money for the purchase of the water rights without the patented area but this money was furnished by the bondholders for

the express purpose of recouping, in part, the amount of money advanced by them for the purchase of the bonds. It follows that no trust relationship arose between the bondholders or the bondholders' committee and the settlers on the patented area. Water rights without the patented area which were owned and enjoyed and put to a beneficial use by settlers without the patented area were vested rights. (*Sanderson v. Salmon River Canal Co., Ltd., supra.*) These water rights were property subject to sale by the owners and subject to be transferred to lands within the patented area. (*Sanderson v. Salmon River Canal Co., Ltd., supra; Village of Hailey v. Riley*, 14 Ida. 481, 95 Pac. 686, 17 L. R. A., N. S., 78; *Bennett v. Twin Falls etc. Co.*, 27 Ida. 643, 150 Pac. 336.) It follows that the operating company, upon the presentation of such certificates with a request for transfer, would be required and was authorized to make such transfers upon its books and to issue new certificates in lieu thereof. The bondholders were under no obligation to purchase these water rights direct from the owners. The mere fact that they had purchased the bonds, the proceeds of which were used in whole or in part in the construction of the system, placed no duty upon them to acquire water rights without the patented area. It would seem apparent that they were in no different situation than any other person who sought to purchase or purchased water rights without the patented area. It would also seem apparent that it would be to the interest of both the settlers and the bondholders' committee that the latter purchase the water rights without the patented area direct from the owners and thus bring about an amicable settlement of the claims of the owners of water rights without the patented area rather than to resort to foreclosure proceedings in order to acquire these rights. Even should it be admitted that the People's Savings & Trust Company purchased at foreclosure sale on behalf of the bondholders, neither the People's Savings & Trust Company nor the bondholders became the successors of the construction company so that they would be obligated to carry out the contract between

the construction company and the settlers, for the reason that under the foreclosure of the trust deed given by the construction company the People's Savings & Trust Company acquired the settlers' contracts, choses in action and all right, title and interest in and to the works and irrigation system constructed by the construction company, "free and discharged of all liens and of the lien and trust of said mortgage, and of all supplements thereto, and all the bonds secured thereby, and of and from the claims of any and all parties to said suit, and any and all persons claiming by, through or under them or either of them." The bonds issued by the construction company were sold upon the public market and it would be inequitable to hold that the purchasers of such bonds, by the mere purchase, would be obligated to carry out the terms of the contract entered into between the settlers and the construction company.

"3. The court erred in its fourth conclusion of law in holding and deciding that all owners of land on said irrigation project are entitled to a proportionate share of the available water supply, without regard to the amount of stock held in the appellant company, and that such water should be distributed *pro rata* on the acreage basis and that each irrigable acre is entitled to the same amount of water."

Ordinarily this contention would be well founded when applied to settlers under a Carey Act project as between the settler and the construction company or the operating company. However, the articles of incorporation of the operating company provide that the water shall be distributed not upon an acreage basis but upon the basis of stock held by the water users. This court has held that an owner of a water right by purchase or original appropriation may sell the water right separate and apart from his land. (*Village of Hailey v. Riley, supra; Bennett v. Twin Falls etc. Co., supra; Sanderson v. Salmon River Canal Co., Ltd., supra.*) Since it has also been held that settlers without the patented area acquired a vested right to the water under their contract with the construction company it would necessarily follow that such right was property and subject to sale by the owner thereof.

"4. The court erred in its sixth conclusion of law in holding and deciding that the delivery of water on the basis of the amount of stock held, to-wit: On the basis of one share per acre to respondents and one and five-sevenths shares per acre to those who held that amount of stock in appellant company, was unjust, unreasonable, illegal, discriminatory and contrary to law.

"5. The court erred in its seventh conclusion of law in holding and deciding that each acre of land on the Salmon project should have and receive its proportionate share of the water supply regardless of the amount of stock of the operating company appurtenant thereto."

"6. The court erred in entering judgment in favor of respondents and against appellants and in ordering and directing that water should be distributed to respondents and all other settlers and land owners on said project on the basis that each acre of land in said project should receive the same amount of water regardless of the amount of stock of the operating company appurtenant thereto."

We think that the contentions raised by the fourth, fifth and sixth assignments of error have been heretofore disposed of.

"7. That the court erred in not sustaining the demurrers of appellants to plaintiff's complaint."

Inasmuch as the record fails to show what disposition was made of the demurrers by the court, the same are deemed to be waived.

"8. The court erred in entering judgment in favor of respondents for costs."

We are of the opinion that the court erred in this respect.

The judgment of the lower court must be reversed in its entirety, and it is so ordered. Costs are awarded to appellants.

McCarthy, C. J., and William A. Lee and Wm. E. Lee, JJ., concur.

Petition for rehearing denied.