(No. 7197. March 15, 1945.)

ROBERT RAYL, in his own behalf and in behalf of all other people similarly situated with him, Appellant, v. SALMON RIVER CANAL COMPANY, LTD., a corporation, Respondent.

[157 P. (2d) 76.]

Rayborn & Rayborn and Harry Povey for appellant.

200

James R. Bothwell for respondent.

GIVENS, J.—Appellant, owner of 700 shares of stock and about 400 acres in Respondent Carey Act Corporation project, now functioning as an operative company, sued on behalf of himself and others similarly situated to prohibit the distribution of water under the following rule adopted by the board of directors June 10, 1943, ratified at a stockholders' meeting January 10, 1944, by 32,649.11 shares of stock voting for and 5,202.10 against:

"RULE 5.—All water in the reservoir will be considered as general storage and allotted according to shares of stock held by individual stockholders; except, however, that individual stockholders may accumulate individual storage as follows: Water users shall be entitled to carry over for use in the following irrigation season as individual storage water, not to exceed one-third of the maximum amount of water allotted to the water user for the season. Any water user who shall carry over or accumulate individual storage water shall accept a reservoir loss, per year, of forty per cent (40%) of the amount of water so carried over. All individual storage water carried over by stockholders must be applied to beneficial use for irrigation in the year succeeding that in which it has been carried over and if not so used shall become a part of general storage."

The learned trial judge entered judgment sustaining the present rule.

Appellant urges that the condemnation of a somewhat similar rule in *Glavin v. Salmon River Canal Co., Ltd.,* 44 Ida. 583, 258 P. 532, demands the rejection of this rule.

Quite obviously the above opinion did not hold and was not intended to hold that irrigation organizations and/or individual appropriators of water could not accumulate within their appropriations and hold storage over from one season to the next, both to encourage and practice economic use of water and to guard against a short run-off in succeeding seasons, because such custom has become too well entrenched in the concept of our water law both by practice and prior and subsequent precept to be thus denounced and forbidden. The court merely held the particular rule offended in certain particulars.

The record herein shows hold-over water in respondent's reservoir thus:[1]

The Twelfth Biennial Report of the State Department of Reclamation for 1941-42, page 75, tabulated the hold-

| [1]Year | Acre Feet | Year | Acre Feet |
|---|---|---|---|
| 1924 | 3715 | 1934 | 125 |
| 1925 | 6695 | 1935 | 3715 |
| 1926 | 3850 | 1936 | 5740 |
| 1927 | 4390 | 1937 | 2905 |
| 1928 | 1250 | 1938 | 6695 |
| 1929 | 2500 | 1939 | 3850 |
| 1930 | 5065 | 1940 | 375 |
| 1931 | 1875 | 1941 | 4255 |
| 1932 | 4660 | 1942 | 25580 |
| 1933 | 750 | 1943 | 48200 |

over in the major reservoirs of the state for three years, illustrative of a general practice.[2]

One example of the breakdown to the individual organizations in Jackson Lake Reservoir is contained in the transmittal by E. V. Berg, State Commissioner of Reclamation, to Governor Chase A. Clark, January 8, 1942 in the report of Lynn Crandall, Watermaster of District 36, covering the upper Snake River valley for 1941: (Page 32).

"All of the Jackson Lake water owned in 1941 by canals below American Falls Reservoir was exchanged for American Falls water, hence the holdovers of such canals at the end of the 1941 season can be determined by subtracting total storage diversions from total rights as given on Plate 14.

"This hold-over water below American Falls at the close of the 1941 season was:

| [2]Reservoir | Contents Sept. 30, 1940 (Acre Feet) | Contents Sept. 30, 1941 (Acre Feet) | Contents Sept. 30, 1942 (Acre Feet) |
|---|---|---|---|
| Jackson Lake Reservoir | 166,350 | 226,110 | 321,330 |
| Henry Lake Reservoir | 36,500 | 38,900 | 43,200 |
| Island Park Reservoir | 17,050 | 39,230 | 60,620 |
| Grassy Lake | 519 | 8,170 | 10,910 |
| Blackfoot-Marsh Reservoir | 43,200 | 50,250 | 74,200 |
| American Falls Reservoir | 264,380 | 319,800 | 410,360 |
| Lake Walcott | 0 | 18,850 | 93,550 |
| Oakley Reservoir | 444 | 796 | 8,475 |
| Mackay Reservoir | 6,750 | 23,790 | 16,750 |
| Salmon River Reservoir | 375 | 4,255 | 25,580 |
| Magic Reservoir | 82,450 | 111,100 | 115,800 |
| Arrowrock Reservoir | 44,200 | 39,090 | 18,460 |
| Deer Flat Reservoir | 27,740 | 52,570 | 29,980 |
| Deadwood Reservoir | 85,320 | 138,790 | 91,400 |
| Owyhee Reservoir | 400,670 | 474,560 | 449,650 |
| Crane Creek Reservoir (Gage heights only) | 32.6 ft. | 41.7 ft. | 36.2 ft. |

|  | Acre ft. |
|---|---|
| "Minidoka Project | 191,727 |
| Milner Low Lift | 12,915 |
| Twin Falls Project | 73,119 |
| North Side Project | 35,421 |
| Gooding Project | 31,424 |
| Idaho Power Company | 16,511 |
| Unallotted Bank Storage Gain American Falls Reservoir | 7,200 |
| Unallotted gain Neeley to Milner | 11,194 |
| Total | 379,511 |

"The combined contents of American Falls and Lake Walcott was 338,650 acre-ft. on Sept. 30, hence at the close of the season upstream reservoirs owed the American Falls reservoir for lower valley hold-overs 40,861 acre-ft. measured at American Falls, or 46,900 acre-ft. measured in the upper reservoir. 2,358 acre-ft. were in Island Park Reservoir and 44,542 acre-ft. in Jackson Lake.

"Upper Valley users also had American Falls hold-overs in Jackson Lake of 163,680 acre-ft. so at the end of the 1941 season there were 208,222 acre-ft. of American Falls water in Jackson Lake."

The records in the office of the State Reclamation Commission as to smaller reservoirs indicate segregated holdovers for three suggestive years.[3]

The right to carry or hold over water for distribution in succeeding seasons according to the quantities contrib-

[3]SMALL RESERVOIRS IN IDAHO,
SHOWING STORAGE HOLDOVERS
As of November 1—Computation in Acre Feet

| Name of Reservoir | Location | Capacity | 1942 | 1943 | 1944 |
|---|---|---|---|---|---|
| Bear Lake | Bear Lake | Undetermined | 290,000 | 480,000 | 550,000 |
| Fish Creek | Blaine | 14,411 | 3,900 | 7,800 | * 6,000 |
| Cedar Creek | Twin Falls | 26,000 | 3,924 | 8,000 | 13,200 |
| Lake Fork | Valley | 15,700 | No record | | |
| Little Wood River | Blaine | 11,708 | *Dry | 4,000 | 2,800 |
| Mud Lake | Jefferson | 35,000 | *5,000 | *5,000 | 9,018 |

*Approximate

uted, i.e., portions of live storage individual organizations were entitled to in any given year but not drawn out by them for their members, has twice been approved by this court.

*American Falls Reservoir Dist. v. Thrall*, 39 Ida. 105, 228 P. 236, having under consideration a comprehensive purview of the overall contract for the construction of the American Falls Reservoir for itself and some five original constituent but otherwise unrelated and distinct organizations, approved the contract in its entirety, which contained provisions providing for segregated hold-over privileges:

(Page 61, ff. 207-209 of transcript)

"30. Whenever any party diverting above American Falls has stored water in American Falls Reservoir, and the said reservoir is in condition to hold the water until the same can be used, such party shall have the right to exchange such stored water in American Falls Reservoir for an equal amount of the stored water in Jackson Lake Reservoir, which exchange shall be made automatically without further action by such party and shall have the right to hold over such carry over water in Jackson Lake Reservoir instead of American Falls Reservoir, and in case of any shortage in the water supply necessary to fill Jackson Lake Reservoir to full capacity, in any following year, the party carrying over such stored water from a previous year shall have the use and benefit of the water carried over so far as necessary to fill the full share of reservoir capacity to which such party is entitled. After American Falls Reservoir shall have been completed, used for three (3) years, and found by the Secretary of the Interior to be an efficient and successful reservoir, and as reliable a storage right as the Minidoka project right in Jackson Lake Reservoir, then a permanent exchange will be made of twenty-three thousand six hundred and sixty three (23,663) acre-feet of the Contractor's storage capacity in American Falls Reservoir for an equal number of acre-feet of storage capacity in Jackson Lake Reservoir. It is understood that the exchanges provided for in this contract are to be made out of the Minidoka project's portion of Jackson Lake Reservoir."

"36. Should there ever, in any year, be such a shortage in the flow of Snake River available for storage in Ameri-

can Falls Reservoir, that such flow available for storage, together with any surplus held over in said reservoir from previous years, is insufficient to fill the reservoir to full capacity, then in such year any party entitled to water from said reservoir, who shall have conserved and held over in said reservoir from the previous year any part of the water which said party was entitled to have received during such previous year, shall be entitled to the use and benefit of the water so held over by such party to the extent that such hold-over water may be necessary to complete the filling of such party's pro rata share of the reservoir capacity. Should there ever be any shortage in the water supply available in Jackson Lake Reservoir for exchange for American Falls storage the amount actually available shall be prorated among those entitled to such exchange."

The contract considered and approved in *Board of Directors v. Jorgensen,* 64 Ida. 538, 136 P. (2d) 461, contained this provision:

[Page 55 of Transcript (a) and (b) ].

"(a)   The District shall not be entitled to hold over to its credit in said reservoir at any one time more stored water than can be stored, subject to paragraph (g) of this article, in sixty-seven and forty-two hundredths percent (67.42%) of the available storage capacity of the reservoir usable for irrigation; that is to say, sixty-seven and forty-two hundredths percent (67.42%) of the capacity thereof other than that reserved for control of flash floods and that reserved for power.

"(b)   Whenever the combined amount of storage water in the Arrowrock Reservoir and the Anderson Ranch Reservoir reaches a point where there remains in the two reservoirs only 45,000 acre-feet unfilled capacity, and additional water shall be available for storage, then such additional storable water shall be considered stored in reservoir capacity made available therefor by reducing and eliminating hold-over storage in the following manner: Water shall be considered released from hold-over storage of the contracting party having on hand the largest amount of hold-over storage water in percent of its maximum hold-over storage as fixed by (a) of this article until such

percent is reduced to that of the party having on hand the next highest percent, then from both parties' hold-over storage, etc., until no party has hold-over storage on hand. Any holdover right to and interest in water considered released upon this paragraph shall be extinguished and terminated."

Thus authorizing holding over segregated water and while it is true that this particular provision was not in dispute, it was nevertheless within the overall approval of the majority opinion unanimous on that point, and the dissent was not addressed to that portion of the contract.

Under the above-approved contracts, when the reservoirs fill to capacity, hold-over rights are wiped out, because those who have not contributed to the hold-over water and therefore may and should not participate in its distribution, may nevertheless not be deprived of their rights to new storage water the succeeding year. Thus it is in the years the reservoirs do not fill that the held-over water is most needed, those contributing reap the advantage of their previous economy but not, as asserted by appellant, at the expense of the other users. Because even if the law compelled every reservoir to be drained dry at the end of every irrigation season, the user who needed more than his allotted share could not take from the economical user, because the latter could himself use and exhaust his water or sell or lease part or all of it.

The rights of respondent's shareholders and the method of distribution were fixed in *Glavin v. Salmon River Co., Ltd.*, 39 Ida. 3, 226 P. 739, on a share basis. That case contains a succinct history of the vicissitudes of respondent, which therefore need not be repeated. Likewise it details how additional stock was made available by purchase by the present water users and the regulation thereof, entirely independent of the rule in question. There is no gain to any owner, small or large, if the present rule be outlawed, and each be compelled to use or sell all water in the current year, instead of conserving for the next year's possible shortage, because the proportion of distribution would be the same. As recited there, the original plan was one share per acre, but contracting the acreage because of insufficient water supply, released additional shares purchasable by those owners whose lands were re-

stricted to the lands retained within the segregation. The limit of owning three and one-fourth shares per acre has been fixed by respondent and is not questioned.

At the close of each irrigation season, the amount of water remaining in the reservoir is measured and each user who has not used his full allotment during the season has credited to him such portion. The succeeding spring, if the reservoir has not filled, this amount not to exceed one-third of his full right and less 40% for loss by seepage and evaporation, is credited to him and delivered as he desires in addition to his share of the new storage accumulated since the preceding fall.

Since only one-third or less of the user's allotment is retainable to the succeeding season and there is only an actual loss by seepage and evaporation of 25%, the 15% differential becomes general storage and enures to the benefit of appellant and all the other stockholders. Thus they are amply protected. The loss by seepage and evaporation and delivery loss of 50% would affect general storage if all water was held over in common, hence no special privilege accrues to or is enjoyed by the economical user in receiving his share of his saving.

· If three and one-fourth shares per acre provides too much water, the fault is not because of held-over water, but because the owner may hold too many shares. The apportionment is, however, not questioned and was declared and approved in *Glavin v. Salmon River Co., Ltd.,* 39 Ida. 3.

Appellant argues the owner of many shares of water stock will profit at the expense of the small holder. The unit of distribution is the same to all, so many inches per share of stock, and whether the stockholder owns many or few shares and uses the water one season or the next, no owner can unfairly profit unless he encroaches upon and partakes of water properly belonging to another and so allotted.

Expenses are assessed on the share basis and the transmission loss of some 50% from the reservoir to the place of individual distribution is borne equally by all, including held-over water.

Inequality of amount is only and solely because some

may own more shares than others, and this would apply if all shared in the held-over water, with this difference however, that the user who did not contribute to the held-over water would profit at the expense of those who had been economical in their use.

There is a fundamental difference with regard to the diversion and use of water from a flowing stream and a reservoir. In a stream if a user does not take out his water, it may be diverted by the other appropriators, because otherwise it flows on and is dissipated. But the very purpose of storage is to retain and hold for subsequent use, direct or augmentary, hence retention is not of itself illegal nor does it deprive the user of the right to continue to hold.

The rights of the constituent organizations in the above reservoirs, while different as to the total amount of water each organization was procuring for its stockholders or users, were equal in point of time and right, therefore, on a parity with the rights of the individual users and appropriators in respondent district. (*Glavin v. Salmon River Canal Co., Ltd.*, 39 Ida. 3.)

"* * * This company is merely a convenient method devised by the state contract for administering the affairs of these water users through the instrumentality of a corporate entity. It would have been competent for them to have administered this whole system in their own proper persons, but the impracticability of so doing was so great that this corporation was created to act on their behalf, and is in effect merely an incorporated water master for the respective water users." (*Boley v. Twin Falls Canal Co.*, 37 Ida. 318 at 329, 217 P. 258.)

Stored water having been diverted from and taken out of the natural streams is no longer public water.

"* * * The waters so impounded then became the property of the appropriators and owners of the reservoir, impressed with the public trust to apply it to a beneficial use. A subsequent appropriator claiming a part or all of such waters would be the only person who could question the lack, extent, or nature of its application to a beneficial use." (*Washington County Irr. Dist. v. Talboy*, 55 Ida. 382 at 389, 43 P. (2d) 943.)

Appellant's position is candidly thus stated:

"* * * In a Carey Act project there is no objection to saving in the reservoir water not needed in any year for use in the future, but any saving must be enjoyed by all of the stock holders and not only a part of them. * * *" (Page 57 of Appellant's brief.)

While this concession would seem to admit that it is legal for general storage to be held over but that the individual user may not, it is confusing and contradictory when considered in connection with appellant's main point of attack on the individual's right to hold over his share (less percentage loss deductions) namely, that use by the individual the succeeding years is not a beneficial use, because if use by the individual the succeeding year of his individual portion of held-over water is not a beneficial use, neither is it of his share of general held-over water.

Application to a beneficial use is an individual matter not collective. Each user must apply his water to a beneficial use and is solely responsible therefor and subject to deprivation if he does not. One user cannot by his neglect forfeit another's right, nor can he be held responsible for another's neglect. As to irrigation the unit user determines beneficial use.

Thus if use the succeeding year by the individual user of his share of general hold-over be beneficial, so would his use of his individual share allotted to him under the questioned rule.

Respondent operating company merely diverts, conveys, stores and distributes, it does not as such apply any water to a beneficial use, nor do the constituent organizations in the other reservoirs, unless they own water by purchase or deed for delinquencies as owned in *In re Robinson*, 61 Ida. 462, 103 P. (2d) 693, not involved herein. The water is applied to beneficial use by the stockholder, the individual water user, (41-1719, I.C.A.). Thus appellant's main argument falls of its own weight because we must recognize general storage as legal since twice specifically approved, yet it rests on individual use as beneficial application exactly the same as use of segregated held-over water.

Appellant argues that if the individual user has water

which can be held over, it is proof conclusive that he has initially acquired more water than he can apply to a beneficial use. The same argument can be applied to the respective organizations storing in the reservoirs above noted, since there is no difference in their connection with each other or their rights and the respective shareholders and water users in respondent corporation. *Glavin v. Salmon River Canal Co., Ltd.,* 39 Ida. 3, declared each water user in respondent operating company and Carey Act segregation is entitled to his definite share in proportion to the number of shares held by him in the reservoir.

"* * * A contract for a specific amount no more warrants or encourages wasteful use than does a judicial decree or State Engineer's permit. The possibility that the settler may not at all times be able to use the maximum of his available right, whether such right be acquired by appropriation or by contract, is without significance. That is only to say that in that event, and for the time being, the water becomes subject to use by others having inferior rights. I know of no consideration of public policy opposed to the exercise by farmers of that degree of prudence which is expected of men in other vocations in providing a margin of saftey to cover contingencies. What would be thought of a hydro-electric company furnishing light and traction facilities to an urban community, if it relied upon a power installation just sufficient to meet the needs of the community in normal years, without any margin of safety to cover the contingency of low water or of casualties known to be incident to such an enterprise? If the settler's right is barely sufficient for his needs in the ordinary years and in the absence of mishaps, manifestly he must suffer loss when the run-off falls below the average, or when, through accidents to the system, there is partial or temporary loss of the use of water, or when, because of light precipitation and other weather conditions, the need of water is unusually large. Ordinarily for the farmer not to make provision against such contingencies would be counted against him for carelessness. So far as I am aware, it has never been held or contended that in making an appropriation of water from a natural stream the appropriator is limited in the right he can acquire to his minimum needs, and no reason is apparent why one who contracts to receive water from another should be limited to such needs. Conservation of water is a wise

public policy, but so also is the conservation of the energy and well-being of him who uses it. Economy of use is not synonymous with minimum use. * * *" (*Caldwell v. Twin Falls Salmon River Land & Water Co.* (Ida.), 225 F. 584 at 595-596.)

Since the hold-over is restricted to one-third of the user's total water for the season, the restriction avoids the condemnation of the former rule, in that the total is so reduced that there would be no more probability or possibility of speculation than there has been without any hold-over, and furthermore, since the statutes and the decisions give a user the right to sell or lease his water held over or otherwise, there is no valid legal basis to prevent his speculating therein, any more than the large unit organizations.

Water was sold and leased prior to and independent of the present rule, which did not go into effect until the irrigation season of 1943, hence speculation is not dependent upon or occasioned by this rule.

Mr. McDaniel, plaintiff witness, testifying:

"Q. Now, Mr. McDaniel, because of three hundred settlers out there, and some two hundred, twenty-six farms delivered water, has the custom grown up there so that heavy owners of stock rent their water out to other farmers?

"A. I think some of the heavy stockholders do, and some of them rent.

"Q. In other words, if they don't have sufficient water, they don't try to farm their place?

"A. If they have poor soil they rent the water out to some that have better soil.

"Q. And there is some settlers on this tract that haven't farmed for years?

"A. Yes, there is.

"Q. And they try to sell or rent it out?

"A. Yes, they sell or rent it out.

"Q. Since you have been there—since 1935, what has water sold there per acre foot? That is the way it has sold?

"THE COURT: You mean selling price or rented price?

"MR. RAYBORN: Seasonal sale price. We know it sells for that one year.

"Q. What is the price when they sell it for cash?

"A. I think it runs all the way from one dollar to ten dollars.

"Q. Ten dollars a foot?

"A. Yes.

"Q. Depending on the demand and season and amount of water available, etc.?

"A. Yes.

"Q. Now then, do some of the farmers—or heavy owners, and people that do not farm their land at all, do they rent their water out on a crop share basis?

"A. They have."

Mr. Parrott, witness for the plaintiff, testifying:

"Q. Have you been farming there since 1913?

"A. I have.

"Q. During that period of time have you bought extra water for your land?

"A. I have.

"Q. Have you bought water by the season, so many feet?

"A. I have.

"Q. What price have you paid?

"A. All the way from two dollars, fifty cents to ten dollars a foot.

"Q. Have you leased water for the season on a share crop basis?

"A. I have.

"Q. What percent of the crop did you give for the use of that water?

"A. One-third.

"Q. And you did that even though you had a regular water right on your land.

"A. Some of the land I don't have water.

"Q. But the third you gave was clear. You paid all expenses and taxes and gave a third of what you produced for the use of the water?

"A. I did.

"Q. What is the largest amount per acre you have paid for the use of that water?

"A. Per acre. . . .

"Q. Use of it, per acre.

"A. I believe twenty-five dollars an acre is the most I have paid.

"Q. Then did you get all the water from somebody else, or furnish part of your own water?

"A. Furnished part of my water.

"Q. And the additional water you got cost you twenty-five dollars per acre?

"A. Yes."

Appellant himself:

"Q. Have you had occasion to lease additional water?

"A. I have.

"Q. Lease it on share basis or pay cash?

"A. Paid cash for it.

"Q. Over a period of how many years have you done that?

"A. Several years.

"Q. Do you remember how much you paid on cash basis?

"A. One time eight dollars and around four dollars last year and the year before.

"Q. Is that per acre foot?

"A. Acre foot.

"Q. Not share basis?

"A. Not share basis."

It will be noted that the appellant refers to "last year and the year before" as to the sale of water. The trial was held February 3, 1944, so that "last year and the year before" referred to years prior to 1943, before the rule was put into effect.

■ The sale of water held over or otherwise is permitted by law, Secs. 41-2101 et seq., I.C.A., and is universally sanctioned, (*Sanderson v. Salmon River Canal Co., Ltd.*, 34 Ida. 145 at 160, 199 P. 999,) and practiced. (*I. E. Bennett v. Twin Fall Etc., Co.*, 27 Ida. 643, 150 P. 336; *Twin Falls Canal Company v. Shippen*, 46 Ida. 787, 271 P. 578; *First Security Bank v. State*, 49 Ida. 740, 291 P. 1064; *In re Department of Reclamation*, 50 Ida. 573, 300 P. 492; *In re Rice*, 50 Ida. 660, 299 P. 664; *Hillcrest Irr. Dist. v. Nampa, Etc. Irr. Dist.*, 57 Ida. 403, 66 P. (2d) 115.)

Whether held over or not the individual user, by allowing portions of his lands to lie idle for a single or several seasons and selling, leasing or using his water on other lands, absent intent to abandon, does not lose or forfeit his right.

"* * * It (water) has never been used in Hillcrest Irrigation District because the efforts made to secure sufficient water to irrigate the lands within that district from Arrowrock Reservoir, in addition to that transferred as above stated, have not been successful. The water so procured and diverted from the New York Canal since July, 1914, has, under a working agreement with the United States Reclamation Service, been used on the Boise Irrigation Project, with the understanding that it should be so used until such time as the district could finance itself

and arrange to apply the water to the lands within the district."

\* \* \* \*

"[2,3]  It is well established in this jurisdiction that a water right may be transferred separately from the lands on which it has been used, provided that to do so does not prejudice the rights of another water user; and that the right to segregate a water right from the lands to which it may be appurtenant inheres in the right of property and ownership in this state."  (*Hillcrest Irr. Dist. v. Nampa Etc. Irr. Dist.*, supra at 406 and 409.)

From 1914 to 1937, the water in the above case was never used on the lands for which it was appropriated and yet the right was sustained as against the attack of other users on all of the points suggested here and more.

No question of injury by change of place of diversion or use is involved herein because the water is all used on the same project out of the same reservoir and canal system, hence there could be no injury of this nature. *In re Robinson,* supra at 470.

It is argued that the capacity. of the ditches are insufficient to carry in all instances the held-over water in addition to live storage.  In the first place, the evidence does not indicate that this is the situation, and in the second place, it is purely an administrative matter and, of course, no user is entitled to carry the full amount of his water at the expense and to the detriment of another user.  The record indicates that a system of rotation is used which would prevent the argued discrimination.

Appellants complain that the additional handling of the held-over water for those users who contributed to the same and under the rule and are permitted to profit thereby would place the extra cost on unbenefited users.  The expenses are prorated on a share-holding basis.  Those who hold over water and use it the succeeding year receive during either season no more than their allotted share of the water, and by paying their proportion of the expenses of handling the same on a share basis, pay for the extra service, since no more than that to which they are entitled is delivered whether in one or two years, and the regular run

of water continues during the entire season and the record does not indicate that the additional distribution to the held over users would cause extended service. No additional water is secured by those who economize in one year to apply it to a beneficial use in the succeeding year. It is certainly unfair and absolutely inequitable to require a person who has been careful and economical in using his water under the rule and preceding season to subsequently share it with other users who are not contributing to such held-over water. If the reservoir fills to capacity, of course, all hold-over rights are out because the hold-over privileges may not be exercised to the detriment of other users.

The argument that because the one user is able to conserve water for the succeeding season indicates that he is receiving more than he can apply to a beneficial use, leads to the conclusion that no reservoir for an entire district or for the individual user could carry over, but that if there was any surplus at the end of any irrigation season, other lands entirely disconnected with any rights theretofore granted would claim that this surplus should go to them which, of course, would entirely disrupt every reservoir system in the state, as appears from a consideration of the illustrative appended data, supra.

The present rule differs radically and remedially from the one voided in *Glavin v. Salmon River Canal Co., Ltd.*, 44 Ida. 583, and restricting the hold-over privileges to the succeeding year, limiting it to one-third of the active right and making provision for fully protective deductions occasioned by loss from seepage and evaporation, which would operate if general hold-over privileges were alone rcognized, justifies approval of this rule without doing violence to or in any way departing from the ruling of this court as to the former rule.

The rule being clearly distinguishable from the former one and freed of its defects and the rights granted thereunder being clearly within the purview of the law, the judgment is affirmed.

Ailshie, C.J., Budge, Holden, and Miller, JJ., concur.